[Cite as *State v. Staley*, 2021-Ohio-3086.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                         :          APPEAL NOS. C-200270
                                                              C-200271
    Plaintiff-Appellee,          :                      C-200272
                                                   TRIAL NOS. 19CRB-19555A
  vs.                            :                      19CRB-19555B
                                                              19CRB-19555C
SONYA STALEY,                          :
                                                      *O P I N I O N.*
    Defendant-Appellant.         :


Criminal Appeals From:  Hamilton County Municipal Court

Judgments Appealed From Are:  Affirmed

Date of Judgment Entry on Appeal:  September 8, 2021


*Andrew Garth*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Meagan D. Woodall*, Assistant Prosecuting Attorney, for Plaintiff-Appellee City of Cincinnati,

*Raymond T. Faller*, Hamilton County Public Defender, and *Krista Gieske*, Assistant Public Defender, for Defendant-Appellant Sonya Staley.

**CROUSE, Judge.**

{¶1}   Defendant-appellant Sonya Staley appeals from three municipal court judgments in which she was convicted of criminal trespass, disorderly conduct, and resisting arrest.  For the reasons set forth below, we affirm the judgments of the trial court.

## I.  Facts and Procedure

{¶2}   On August 1, 2019, Cincinnati Police Officer Carlos Sherman was working an off-duty detail for the Cincinnati Center City Development Corporation ("3CDC") at Ziegler Park.  Around 5:30 p.m., Sherman received a request for assistance from a 3CDC staff member.  When Sherman arrived on the scene, he saw Staley lying flat on a cement park bench with sunglasses covering her eyes.  According to Sherman, 3CDC had recently implemented a rule that prohibited park goers from lying down in Ziegler Park.  He testified that the policy was put into effect that summer as a means of decreasing the number of false overdose calls received by the city.

{¶3}   Sherman testified that he approached Staley and asked her to sit up in accordance with park policy.  Sherman claimed that he repeated the order three or four times before Staley briefly sat up.  Staley testified that she informed Sherman that she could not sit for extended periods of time due to a medical condition.  She then lay back down on the bench.  At that point, Sherman activated his body-worn camera.  The body camera captured the remainder of the encounter.

{¶4}   The video footage shows Staley lying on the bench with Sherman and a 3CDC member standing next to her.  Sherman told Staley, "I'm going to ask you one more time ma'am to sit up. * * * They don't want you laying down at the park.  I already had to tell one person to leave."  When Staley refused, Sherman instructed

2

her to leave the park. Sherman ordered her to leave four more times before she stood up. Staley then gathered her belongings, got her son from the playground and put on his shoes, and began walking out of the park. The entire time Staley argued with Sherman and loudly berated him in front of the other park goers. The body camera captured Staley using the following language toward Sherman: "Uncle Tom," "Fuck you," "Fuck you, dickhead," "puttin' on for these honkeys," and "ass kissin' for these honkeys." Sherman warned Staley that if she continued to use such language around the children in the park, he would arrest her for disorderly conduct. Staley persisted in using the derogatory language.

{¶5} Approximately four minutes into the encounter, Sherman informed Staley that she was under arrest and contacted other officers for assistance. Instead of complying with Sherman's demands, Staley walked across the street, entered the Ziegler Park basketball court, and continued causing a scene. Sherman attempted to handcuff Staley on three separate occasions, but she pulled away. Staley was eventually arrested by another responding officer. The body-cam footage shows that eight minutes elapsed between Sherman's first request for Staley to leave the park and Staley's arrest.

{¶6} Staley was subsequently charged with criminal trespass, disorderly conduct, and resisting arrest. On February 19, 2020, Staley waived her right to be tried by a jury and proceeded to a bench trial. The trial court found Staley guilty on all charges. Due to the COVID-19 shutdown, Staley's sentencing was continued until July 29, 2020.

{¶7} On the morning of sentencing, Staley filed a motion for a new trial pursuant to Crim.R. 33(A)(2). Staley argued that the state had failed to disclose prior citizen complaints against Sherman. Staley posited: "In preparing for

3

sentencing, defense counsel has been made aware of at least 20 complaints from 2009-2013 that were made to the [Citizen Complaint Authority], two being substantiated." None of the complaints were provided in the record or attached to Staley's motion. The trial court denied the motion and proceeded to sentencing. Staley received a suspended 90-day jail sentence and one year of probation. Staley filed this timely appeal, raising four assignments of error for our review.

## II. Sufficiency and Weight of the Evidence

{¶8} In her first assignment of error, Staley argues that her convictions are supported by insufficient evidence and are against the manifest weight of the evidence.

{¶9} A sufficiency-of-the-evidence argument challenges the adequacy of the evidence on each element of the offense. In reviewing a sufficiency challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 274, 574 N.E.2d 492 (1991).

{¶10} A manifest-weight-of-the-evidence argument challenges the believability of the evidence. In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice. *Id.*

### 1. Criminal Trespass

{¶11} Staley was convicted of criminal trespass in violation of R.C. 2911.21(A)(1), which provides: "No person, without privilege to do so, shall * * *

4

[k]knowingly enter or remain on the land or premises of another[.]" Staley argues that she was not without privilege to remain in Ziegler Park, or if she was without privilege, that she left the premises when told to do so.

{¶12} "Privilege" is the distinguishing characteristic between criminal trespass and lawful presence. *State v. Casey*, 8th Dist. Cuyahoga No. 99742, 2014-Ohio-1229. "As a general rule, a person has a privilege to enter and be upon the public areas of public property." *State v. Shelton*, 63 Ohio App.3d 137, 578 N.E.2d 473 (4th Dist.1989). However, the rule is not all encompassing, and a criminal trespass can be committed on public land under certain circumstances. *State v. Newell*, 93 Ohio App.3d 609, 611, 639 N.E.2d 513 (1st Dist.1994), citing *Adderley v. Florida*, 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966). The General Assembly has made it clear that a trespass is not excused simply because the property involved is publicly owned. *See* R.C. 2911.21(B) ("It is no defense to a charge under this section that the land or premises involved was owned, controlled, or in custody of a public agency.").

{¶13} Because "the status of land as public property cannot be a defense to a charge of trespass * * * then, concomitantly, the public official or agency into whose charge the property is put can withdraw or revoke the privilege otherwise enjoyed by a member of the public." *Dayton v. Moore*, 2d Dist. Montgomery No. 13369, 1993 WL 81966, *3 (Mar. 25, 1993). Thus, regardless of an individual's initial privilege to enter and be upon public property, "an owner or agent may revoke consent to remain on the premises." *State v. Carr*, 3d Dist. Union No. 14–11–20, 2012-Ohio-1679, ¶ 24.

{¶14} In this case, Staley asks us to take judicial notice that Ziegler Park is a city-owned space, managed by 3CDC. *Ziegler Park*, https://zieglerpark.org/about/ (accessed August 25, 2021). Evid.R. 201(B) permits a court to take judicial notice of

5

adjudicative facts of the case that "are not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Judicial notice may be taken at any stage in the proceeding, even on appeal. Evid.R. 201(F); *Noe v. Housel*, 2020-Ohio-1537, 153 N.E.3d 941 (6th Dist.), quoting *State v. Mays*, 83 Ohio App.3d 610, 614, 615 N.E.2d 641 (4th Dist.1992).

{¶15} 3CDC is a nonprofit real estate company entrusted with the maintenance, safety, and security of Ziegler Park. *Ziegler Park*, https://zieglerpark.org/about/about-3cdc/ (accessed August 27, 2021). The testimony at trial established that 3CDC hires off-duty city police officers to enforce the rules and regulations of the park. Sherman testified that on August 1, 2019, he was working an off-duty detail for 3CDC.

{¶16} It is undisputed that Sherman revoked Staley's privilege to remain in Ziegler Park. The key question is whether he had the proper authority to do so.

{¶17} R.C. 2911.21 does not require a particular basis for revoking an individual's privilege to be on public property. However, the majority of Ohio courts have held that "the privilege to enter or remain upon specific property, once granted or conferred, may not be withdrawn arbitrarily or capriciously." *City of Columbus v. Andrews*, 10th Dist. Franklin No. 91AP-590, 1992 WL 41243, *7 (Feb. 27, 1992). *See State v. Manley*, 3d Dist. Allen No. 1-97-52, 1998 WL 122213, *2 (Mar. 18, 1998); *State v. Donahue*, 5th Dist. Fairfield No. 2004-CA-20, 2005-Ohio-1478, ¶ 61. Those courts require a "reasonable or legitimate basis for withdrawing the privilege." *Andrews* at *11. According to the Tenth District:

This is particularly true with regard to persons charged with the supervision of public property. As they are not the actual owners of the property, they have no right to exclude persons from the property for any reason or no reason at all. As public officers, they must act reasonably and within the scope of their authority. When a person charged with the supervision of public property acts unreasonably or exceeds the scope of his or her authority, the purported revocation of the privilege to enter the property is void and of no further effect.

*Id.*

{¶18} In this case, Sherman testified that he acted at the behest of a 3CDC employee, who can be seen standing next to Sherman in the body-cam footage. According to Sherman, the 3CDC employee requested his assistance because Staley was violating a recently-implemented rule prohibiting park goers from lying on the premises. When Sherman approached Staley, she was lying flat on her back on a cement park bench. Sherman testified that he asked Staley to sit up three or four times. When Staley did not comply, Sherman instructed her to leave the park.

{¶19} Staley disputes the existence of 3CDC's park rule, and thus, Sherman's authority to revoke her privilege to remain in the park. However, even if 3CDC's alleged park rule does not provide Sherman with the proper authority, we take judicial notice of the city of Cincinnati's Park Board Rule 37, entitled "Lying Upon Park Property." City of Cincinnati, *Park Board Rules*, https://www.cincinnatiparks.com/about-us/park-board-rules/ (accessed August 25, 2021). Rule 37 provides in pertinent part, "No person may lie upon any bench or ledge on park property." *Id.* Thus, we find that Sherman had a reasonable and legitimate basis to revoke Staley's privilege to remain in Ziegler Park.

7

**{¶20}** Staley claims that she was in the process of leaving Ziegler Park when she was arrested. The state counters that Sherman repeatedly asked Staley to leave, and yet, she remained on the premises until she was arrested.

**{¶21}** R.C. 2911.21 does not provide a time limit for leaving the premises once privilege is revoked. However, several courts have held that a guest must immediately leave once the privilege to remain on the premise is withdrawn. *See City of Kettering v. Kemp*, 2d Dist. Montgomery No. 13396, 1993 WL 106142, *1 (Mar. 29, 1993) ("[I]f one remains on the premises once he's requested to leave, the offense is complete."); *State v. Todd*, 12th Dist. Butler No. CA 2001–04–0929, 2001 WL 1079622 (Sept. 17, 2001) ("If the complainant asked the guest to leave, had the authority to ask the guest to leave, and the guest did not immediately leave the premises, then the guest was trespassing."). Thus, "[e]vidence that a guest was asked to leave the premises repeatedly and failed to make an effort to do so supports a conviction for criminal trespass." *State v. Tingler*, 7th Dist. Belmont No. 16 BE 0015, 2017-Ohio-4158, ¶ 11, citing *City of Steubenville v. Johnson*, 7th Dist. Jefferson No. 96JE17, 1997 WL 467582, *3 (Aug. 7, 1997).

**{¶22}** A review of the record shows that Staley remained in Ziegler Park despite numerous instructions to leave. Over the course of one minute, Sherman asked Staley to leave the park six or seven times. After the second request, Sherman threatened to arrest Staley for criminal trespass. After the fifth request, Staley actively began leaving. Staley got her son from the playground, put on his shoes, and collected her belongings. However, the entire time Staley prolonged the process by questioning and arguing with Sherman. Staley stopped walking and turned around to video record Sherman on her cell phone approximately six times on her way out of the park. When Sherman instructed Staley to "head out to the sidewalk" and "keep

walking," Staley responded "you ain't gonna touch me and make me" and "I'm taking my time." Under these circumstances, there was sufficient evidence to support Staley's conviction for criminal trespass under R.C. 2911.21(A)(1).

{¶23} There being sufficient evidence to support the conviction for criminal trespass, we next consider whether the conviction was against the manifest weight of the evidence.

{¶24} Staley contends that her conviction was against the manifest weight of the evidence because it was the product of racial targeting. However, this argument does not concern the weight of the evidence. It instead sounds in selective prosecution, which Staley did not properly raise. To the extent that Staley is claiming Sherman is racially biased, and thus, not credible, that is a determination best left to the trier of fact. Because Sherman's testimony was corroborated by the body-cam footage, which showed Staley lying on the park bench and failing to leave the premises when repeatedly asked to do so, we do not hold that the trial court clearly lost its way and created such a manifest injustice that Staley's conviction for criminal trespass must be reversed.

2. Disorderly Conduct

{¶25} Staley was also convicted of disorderly conduct in violation of R.C. 2917.11(A)(2), which provides: "No person shall recklessly cause * * * alarm to another by * * * communicating unwarranted and grossly abusive language to any person[.]" Staley claims that her words neither caused alarm nor constituted unconstitutional speech, and thus, were insufficient to support a conviction under R.C. 2917.11(A)(2).

{¶26} The Ohio Supreme Court has held that a person may not be found guilty of disorderly conduct under subsection (A)(2) unless the words spoken are

"fighting words." *State v. Hoffman*, 57 Ohio St.2d 129, 133, 387 N.E.2d 239 (1979), paragraph one of the syllabus. That is, the words spoken are "likely by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *Id.*

{¶27} In determining whether Staley's language rose to the level of fighting words, we must consider the totality of her conduct, both verbal and physical. *State v. Beamer*, 5th Dist. Coshocton No. 11CA14, 2012-Ohio-2222, ¶ 11; *Middletown v. Carpenter*, 12th Dist. Butler No. CA2006-01-004, 2006-Ohio-3625, ¶ 14. Here, Staley used derogatory language in the midst of a public park playground, surrounded by numerous children and other park goers. Over the course of four minutes, Staley used several profane epithets to reflect her anger toward Sherman. Staley called Sherman an "Uncle Tom" a dozen times; told Sherman, "Fuck you," multiple times; and stated "Fuck you, dickhead," to Sherman as she left the park. Staley also shouted that Sherman was "puttin' on for these honkeys" and "ass kissin' for these honkeys." Furthermore, Staley displayed aggressive behavior toward Sherman by throwing her elbow at him and stating "You ain't gonna touch me and make me [leave]. I bet you won't touch me." Sherman warned Staley, "you use one more cuss word in front of these kids, I'm gonna take you to jail for DC." Nonetheless, Staley continued to draw attention to the incident and openly involve other park goers. A review of the footage shows several alarmed children and onlookers. Under these circumstances, Staley's words and behavior together constituted "fighting words" not protected by the Constitution. Accordingly, there was sufficient evidence to support Staley's conviction for disorderly conduct under R.C. 2917.11(A)(2).

10

**{¶28}** We likewise find that the conviction was supported by the manifest weight of the evidence. Staley largely reiterates her arguments under the sufficiency challenges. She contends that the manifest weight of the evidence does not support a conviction for disorderly conduct because her speech neither caused alarm nor rose to the level of fighting words. However, as described above, the video footage provides credible evidence that Staley used abusive language and displayed aggressive behavior in the midst of a public park, surrounded by children and other park goers. Therefore, we do not hold that the trial court clearly lost its way and created such a manifest injustice that Staley's conviction for disorderly conduct must be reversed.

### 3. Resisting Arrest

**{¶29}** Staley was further convicted of resisting arrest in violation of R.C. 2921.33(A), which provides: "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."

**{¶30}** Staley argues that Sherman lacked probable cause to believe she had committed a criminal offense, and thus, she was not lawfully under arrest. However, as detailed above, we find that Staley's conduct amounted to two arrestable offenses: criminal trespass and disorderly conduct. Because there was a lawful basis on which to arrest Staley, there was sufficient evidence to support her conviction under R.C. 2921.33(A).

**{¶31}** Staley further argues that the manifest weight of the evidence does not support her conviction for resisting arrest because Sherman used excessive force to effectuate the arrest. In particular, Staley contends that Sherman "snatched her hair and tried to pull her away." The state counters that Sherman simply put his hand on Staley's hair and did not use any force against her.

11

**{¶32}** It is true that "an officer's use of excessive force is an affirmative defense to resisting arrest." *In re M.H.*, 2021-Ohio-1041, 169 N.E.3d 971, ¶ 35 (1st Dist.). However, "resisting arrest and resisting an officer's use of excessive force in making an arrest are two different things." *State v. Elko*, 2020-Ohio-4466, 158 N.E.3d 929, ¶ 40 (8th Dist.). Specifically, the Sixth Circuit Court of Appeals has determined that only "pre-arrest excessive force is an affirmative defense to a charge of resisting arrest in Ohio." *Hayward v. Cleveland Clinic Found.*, 759 F.3d 613 (6th Cir.2014). Thus, where a defendant's resistance precipitates an officer's use of force, the defendant cannot successfully assert the defense of excessive force.

**{¶33}** That is exactly what happened in this case. Approximately four minutes into the encounter, Sherman told Staley that she was under arrest. Instead of complying with Sherman's demands, Staley walked across the street, entered the basketball court, and continued causing a scene. Sherman attempted to handcuff her on three separate occasions, but Staley pulled away. Staley only submitted to the arrest after a female officer arrived on the scene. It was not until the female officer was effectuating the arrest that Sherman grabbed ahold of Staley's hair. Because Sherman's use of force occurred after Staley's resistance, Staley failed to establish the affirmative defense of excessive force. Accordingly, the trial court did not clearly lose its way and create such a manifest injustice that Staley's conviction for resisting arrest must be reversed.

**{¶34}** Staley's first assignment of error is overruled.

### III. Alleged Brady Material

**{¶35}** In her second, third, and fourth assignments of error, Staley presents several challenges based on the state's alleged violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In her second and third assignments

of error, Staley contends that her due-process and fair-trial rights were violated when the state committed prosecutorial misconduct by failing to disclose material impeachment evidence, e.g., citizen complaints filed against Officer Sherman. In her fourth assignment of error, Staley argues that the trial court erred in denying her motion for a new trial on those same grounds. For ease of discussion, we start with her fourth assignment of error.

{¶36} We review a trial court's denial of a motion for a new trial under an abuse-of-discretion standard. *State v. Smith*, 1st Dist. Hamilton Nos. C-180439 and C-180604, 2019-Ohio-5350, ¶ 15.

{¶37} Pursuant to Crim.R. 33(A)(2), a new trial may be granted on the grounds of prosecutorial misconduct. Prosecutorial misconduct includes the failure to disclose materially exculpatory evidence, including evidence that undermines a witness's credibility. *State v. Campbell*, 2019-Ohio-3142, 140 N.E.3d 987, ¶ 43 (1st Dist.). Motions for a new trial based on prosecutorial misconduct must be filed within 14 days after the decision of the trial court. Crim.R. 33(B). Motions for a new trial may be filed beyond the 14-day period only where the defendant was "unavoidably prevented" from filing the motion. *Id.*

{¶38} In this case, the trial court entered its decision on February 19, 2020. Staley did not file her motion for a new trial until July 29, 2020, over 160 days later. Following a hearing on the motion, the trial court found that Staley was not unavoidably prevented from filing the motion within the 14-day period prescribed by Crim.R. 33(B), and denied the motion.

{¶39} A review of the record supports the trial court's conclusion. Staley's counsel received the citizen complaint records by preforming a search on a public database. There is no evidence that the database was unavailable prior to July 29,

13

2020. Counsel claimed only that "she didn't know it existed" until July 28, 2020. Thus, there is no evidence that Staley was unavoidably prevented from discovering the undisclosed complaint records within the time prescribed by Crim.R. 33. Accordingly, the trial court did not abuse its discretion in denying Staley's motion for a new trial based on that evidence.

{¶40} Even assuming Staley was unavoidably prevented from discovering the citizen complaint records, her motion still fails on its merits.

{¶41} "The suppression by the prosecution of evidence favorable to an accused violates due process where the evidence is material either to guilt or punishment[.]" *State v. Johnston*, 39 Ohio St.3d 48, 529 N.E.2d 898 (1988), paragraph four of the syllabus, citing *Brady*, 373 U.S. at 87, 83 S.Ct. 1194, 10 L.Ed.2d 215. Evidence is materially exculpatory " 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " *Johnston* at 61, quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The test is stringent," and thus, " '[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' " *State v. Jackson*, 57 Ohio St.3d 29, 33, 565 N.E.2d 549 (1991), quoting *United States v. Agurs*, 427 U.S. 97, 109-110, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

{¶42} The defendant bears the burden of proving that withheld evidence is materially exculpatory. *State v. Benson*, 152 Ohio App.3d 495, 2003-Ohio-1944, 788 N.E.2d 693, ¶ 11 (1st Dist.), citing *State v. Benton*, 136 Ohio St.3d 801, 805, 737 N.E.2d 1046 (2000).

{¶43} To satisfy the materiality requirement, Staley suggests that the complaint records would have negatively affected the credibility of the state's sole witness, Officer Sherman. Staley speculates that the undisclosed records might have contained instances of police misconduct, racial bias, and a history of untruthfulness on behalf of Sherman. According to Staley, there is a "strong possibility that the civilian complaints would have supported the defense's theory that Officer Sherman unfairly targeted and harassed Ms. Staley on the day in question and thereby impeached the state's sole witness."

{¶44} But there is nothing in the record to support that claim. Counsel posited that from 2009 to 2013, 20 complaints were filed with the Citizen Complaint Authority against Sherman. Counsel provided brief descriptions of the complaints, such as "lack of service," "off-duty conduct," and "discourtesy." Counsel alleged that two of the complaints were substantiated. However, counsel claims she could not access the entirety of the complaints and did not know any specific details from the complaints. Counsel even admitted, "I don't know what these things are." None of the complaints were provided in the record. Thus, Staley failed to show that the undisclosed complaint records contained materially exculpatory information.

{¶45} Staley's second, third, and fourth assignments of error are overruled.

### V. Conclusion

{¶46} For the foregoing reasons, Staley's assignments of error are overruled and the judgments of the trial court are affirmed.

Judgments affirmed.

WINKLER, J., concurs.
ZAYAS, P.J., concurs in judgment only.

15

Please note:

The court has recorded its own entry on the date of the release of this opinion.

