[Cite as *State v. Harris*, 2023-Ohio-4387.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-230074 |
| | | TRIAL NOS. 22CRB-18454A, B, C, D |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| JOHN HARRIS, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: December 6, 2023

*Emily Smart Woerner*, City Solicitor, *William T. Horsely*, Chief Prosecuting Attorney, and *Ashton Tucker*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Raymond T. Faller*, Hamilton County Public Defender, and *Lora Peters*, Assistant Public Defender, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1}     Defendant-appellant John Harris appeals his convictions for aggravated menacing, obstruction of official business, being in the park after hours, and criminal trespass.  Harris raises one assignment of error that argues his various convictions were based on insufficient evidence and against the manifest weight of the evidence.  For the following reasons, we affirm the judgments of the municipal court.

## Background

{¶2}     Around 4:45 a.m. on October 25, 2022, Harris was in Washington Park warming his hands from a lit heater stored by the gazebo in the center of the park. Washington Park is a public park owned by the Cincinnati Park Board and is open from 6:00 a.m. to 11:00 p.m.  The park is managed by the Cincinnati City Center Development Corporation ("3CDC").  A 3CDC employee saw Harris at the gazebo and called the police to have Harris removed from the park.

{¶3}     Cincinnati Police Officer Chris Vogelpohl was on detail for 3CDC that night to patrol parking lots managed by 3CDC.  Officer Vogelpohl was dispatched and approached Harris, who was standing by the gazebo with his hands above the lit fire of a patio heater.  Officer Vogelpohl asked to see Harris's identification, but Harris refused to produce it.  Instead, Harris gathered his bags and started walking away from Officer Vogelpohl.

{¶4}     This was not the first time that Harris and Officer Vogelpohl interacted. It is unclear from the record what transpired in those previous encounters, but the record indicates that Officer Vogelpohl had encountered Harris three times previously and each time, demanded Harris's identification.  The record indicates Harris produced his identification each time but exchanged heated words with Officer

2

Vogelpohl. Officer Vogelpohl did not charge or ticket Harris in any of these encounters.

{¶5} As Harris gathered his belongings and took his first steps away from Officer Vogelpohl, the officer said, "Sir, I'm going to give you a ticket for being in the park after hours." Harris began arguing with Officer Vogelpohl while continuing to walk away from him. Harris argued that he was allowed to walk through the park and denied lighting the heater.

{¶6} After Harris left Washington Park and crossed the street, he yelled to Officer Vogelpohl that Harris "would blow [Officer Vogelpohl's] brains out." Harris then continued down the street while carrying two bags, with one in each hand. Officer Vogelpohl followed Harris, asking him to repeat the statement. Harris eventually stopped and dropped the bag held in his right hand and reached for the bag held in his left hand. Officer Vogelpohl drew his firearm in response. Harris did not take anything out of either bag, but walked down the street, leaving one bag behind. Officer Vogelpohl followed Harris and called for backup. Harris turned around the block and went down an alley.

{¶7} A police cruiser pulled down the alley in front of Harris to block him. Officer Vogelpohl ordered Harris to stop. Harris ran around the police cruiser and down the alley, heading back to Washington Park. Officer Vogelpohl and the police cruiser chased Harris and caught up with him at the same corner where Harris yelled that he would blow Officer Vogelpohl's brains out. Officer Vogelpohl arrested Harris.

{¶8} Harris was charged with four offenses: aggravated menacing in violation of R.C. 2903.21, obstruction of official business in violation of R.C. 2921.31, being in the park after hours in violation of Cincinnati Park Board Rule 21

3

("Park Rule 21"), and criminal trespass in violation of R.C. 2911.21(A)(1). Harris was tried in municipal court by a jury on the aggravated-menacing, obstruction, and trespass counts, and tried to the bench on the count of being in the park after hours.

{¶9} Officer Vogelpohl testified to the events on that night and walked the jury through the recording on his body-worn camera. Officer Vogelpohl testified at first that he "didn't like" Harris saying that he would blow his brains out. On redirect examination, Officer Vogelpohl testified that Harris's statement made him feel afraid and explained how his training as a police officer limited how his fear showed on his body-worn camera recording.

{¶10} Harris took the stand in his own defense and testified that he walked away from Officer Vogelpohl and did not produce his identification because he had done so on previous occasions.

{¶11} After trial, the jury found Harris guilty on the aggravated-menacing, obstruction-of-official-business, and criminal-trespass charges. Harris was convicted by the court on the charge of being in the park after hours. Harris now timely appeals all four convictions.

### Law and Analysis

{¶12} Harris raises a sole assignment of error, arguing his four convictions were based on insufficient evidence and were contrary to the manifest weight of the evidence. Though Harris raises both challenges together in the sole assignment of error depending on the conviction, "a challenge to the sufficiency of the evidence differs from a challenge to the manifest weight of the evidence." *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 69.

{¶13} Broken down for each conviction, Harris argues (1) his conviction for aggravated menacing was contrary to the manifest weight of the evidence, (2) his conviction for obstructing official business was not supported by sufficient evidence and was contrary to the manifest weight of the evidence, and (3) his convictions for criminal trespass and being in the park after hours were not supported by sufficient evidence and were contrary to the manifest weight of the evidence. For organizational clarity, we address Harris's arguments in the order he made them.

### I. Standard of Review

{¶14} A challenge to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial. *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). It is a question of law that we review de novo. *State v. Ellison,* 178 Ohio App.3d 734, 2008-Ohio-5282, 900 N.E.2d 228, ¶ 9 (1st Dist.), citing *Thompkins* at 386 (Cook, J., concurring). A challenge to the sufficiency of the evidence requires a court to review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could have found that all essential elements of a crime were proved beyond a reasonable doubt. *State v. Sims,* 1st Dist. Hamilton Nos. C-150252 and C-150253, 2015-Ohio-4996, ¶ 7. In deciding whether the evidence is sufficient, an appellate court does not "resolve evidentiary conflicts nor assess the credibility of the witnesses." *State v. Thomas,* 1st Dist. Hamilton No. C-120561, 2013-Ohio-5386, ¶ 45.

{¶15} In contrast to a challenge to the sufficiency of evidence, in deciding whether a conviction is against the manifest weight of the evidence, an appellate court determines whether the state has appropriately carried its burden of persuasion.

*Thompkins* at 390 (Cook, J., concurring). When reviewing a challenge to the manifest weight of evidence, an appellate court sits as the "thirteenth juror" and "review[s] the entire record, weigh[s] the evidence, consider[s] the credibility of the witnesses, and determine[s] whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *Sims* at ¶ 7, citing *Thompkins* at 387 (Cook, J., concurring). An appellate court may substitute its judgement for that of the trier of fact on the issue of witness credibility when "it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Porter,* 1st Dist. Hamilton No. C-200459, 2021-Ohio-3232, ¶ 25. However, an appellate court may not substitute its own judgement for that of the trier of fact "[w]here reasonable minds can reach different conclusions upon conflicting evidence." *State v. Jenks,* 61 Ohio St.3d 259, 279, 574 N.E.2d 492 (1991).

## II.  Aggravated Menacing

{¶16}   First, Harris argues that his conviction for aggravated menacing is contrary to the manifest weight of the evidence. The aggravated-menacing statute provides that "[n]o person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person." R.C. 2903.21(A). Harris concedes that he knowingly threatened to blow Officer Vogelpohl's brains out and that act would constitute serious physical harm. However, Harris argues that Officer Vogelpohl's testimony about his belief that Harris would cause serious physical harm was not credible.

{¶17}   Generally, the jury is in the best position to assess the credibility of the witnesses and can freely accept or reject testimony. *State v. French*, 1st Dist. Hamilton No. C-050375, 2007-Ohio-726, ¶ 24, citing *State v. DeHass*, 10 Ohio St.2d 230,

6

227 N.E.2d 212, (1967), paragraph one of the syllabus. Hence, a verdict is not against the manifest weight of the evidence where the jury's resolution of credibility is reasonable and where the jury ultimately chose to believe the state's witness as opposed to the defense witness. *See State v. Brown*, 9th Dist. Summit No. 26490, 2013-Ohio-5112, ¶ 20, citing *State v. Andrews*, 9th Dist. Summit No. 25114, 2010-Ohio-6126, ¶ 28.

{¶18} Harris argues two issues with Officer Vogelpohl's testimony. First, Harris argues Officer Vogelpohl's actions shown on his body-worn camera contradict his claim that he was afraid. Officer Vogelpohl did not call for backup or seek cover when threatened. Instead, he followed Harris asking, "You're going to do what?" to get Harris to repeat the threat. Officer Vogelpohl drew his firearm only after Harris dropped one bag to reach another. Second, Harris notes that Officer Vogelpohl only testified on redirect after the lunch break that he took the threat seriously and was afraid, but he initially testified that Harris's threat frustrated him. Harris testified that previous interactions with Officer Vogelpohl had gone poorly, and that Officer Vogelpohl was harassing Harris.

{¶19} We hold the jury did not lose its way and create a manifest miscarriage of justice when it found Harris guilty of aggravated menacing. The jury watched the body-worn camera video which recorded Harris making the threat, heard both Harris's and Officer Vogelpohl's testimony about what happened that night, and observed both witnesses on the stand. The jury did not lose its way when it found Officer Vogelpohl's fear credible based on the events of the night and Officer Vogelpohl's explanation of his own thoughts and feelings. *See State v. Carson*, 1st Dist. Hamilton No. C-180336, 2019-Ohio-4550, ¶ 19. The jury was free to accept

Officer Vogelpohl's version of the events and reject Harris's version of events, particularly where, as here, the jury watched a video recording of the threat and observed Harris's tone and demeanor in that moment. To the extent that Harris claimed Officer Vogelpohl is racially biased, and thus his testimony is not credible, that is a determination best left to the jury. *See State v. Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, ¶ 24. Accordingly, Harris's conviction for aggravated menacing was not contrary to the manifest weight of the evidence.

### III. Obstruction of Official Business

{¶20} Second, Harris argues his conviction for obstructing official business was not supported by sufficient evidence and was contrary to the manifest weight of the evidence.

{¶21} To support a conviction for obstructing official business under R.C. 2921.31(A), the state must prove that Harris "(1) performed an act; (2) without privilege; (3) with purpose to prevent, obstruct, or delay the performance of a public official of any authorized act within the public official's official capacity; and (4) that hampered or impeded the performance of the public official's duties." *In re Payne*, 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, ¶ 11. Harris's argument focuses on element (3), whether he purposefully obstructed official business, and element (4), whether his actions hampered or impeded Officer Vogelpohl's investigation.

{¶22} Turning to whether Harris actually hampered or impeded Officer Vogelpohl's investigation, not every act that "can conceivably be said to hinder a police officer rises to the level of criminal conduct." *Id*. at ¶ 16. Interference with the police by citizens must be " 'viewed as a continuum along which, at a certain point, the line

is crossed' " where the conduct is punishable. *Id.*, quoting *State v. Stayton*, 126 Ohio App.3d 158, 164, 709 N.E.2d 1224 (1st Dist.1998). R.C. 2921.31(A) does not criminalize every "minor 'delay, annoyance, irritation, or inconvenience' " put on a police officer. *State v. Harris*, 2018-Ohio-4316, 121 N.E.3d 21, ¶ 16 (4th Dist.), quoting *State v. Vitantonio*, 2013-Ohio-4100, 995 N.E.2d 1291 (11th Dist.), ¶ 14, quoting *Lakewood v. Simpson*, 8th Dist. Cuyahoga No. 80383, 2002-Ohio-4086, ¶ 16.

{¶23} Rather, the statute criminalizes conduct where the defendant commits an affirmative act, and that affirmative act creates a "substantial stoppage" in the police officer's official business. *See State v. Grice*, 180 Ohio App.3d 700, 2009-Ohio-372, 906 N.E.2d 1203, ¶ 12 (1st Dist.). A "substantial stoppage" is not a set period of time; rather the defendant's act must "actually hamper or impede" the officer's performance of official duties. *State v. Wellman*, 173 Ohio App.3d 494, 2007-Ohio-2953, 879 N.E.2d 215, ¶ 18 (1st Dist.). Additionally, the defendant need not be successful in preventing the officers from performing their duties; merely obstructing the officers from doing so is enough. *Id.* at ¶ 19. The mere refusal to produce identification upon request of a police officer is not an "affirmative act" for the purposes of obstructing official business. *Grice* at ¶ 9. Ordinarily, an individual can be found guilty of obstructing official business by performing a specific act after a police officer has ordered him or her to stop. *State v. Gibson*, 2019-Ohio-1022, 133 N.E.3d 1006, ¶ 19 (2d Dist.), quoting *City of Girard v. Oakman*, 2018-Ohio-1212, 110 N.E.3d 530, ¶ 52 (11th Dist.). But "if an officer has the right to detain an individual, the individual cannot continue walking away from the officer once he or she is aware that the officer is trying to detain him or her." *State v. Easterling*, 2019-Ohio-2470, 139 N.E.3d 497, ¶ 37 (2d Dist.), quoting *State v. Harris*, 2015-Ohio-5378,

56 N.E.3d 286, ¶ 7 (9th Dist.); *see State v. Lohaus*, 1st Dist. Hamilton No. C-020444, 2003-Ohio-777, ¶ 11-12 (holding R.C. 2921.31 prohibits "fleeing from a lawful *Terry* stop across several lawns after being told to stop * * * .").

{**¶24**} Harris did not obstruct official business when he refused to provide his identification at the outset of the encounter, or argued with and swore at Officer Vogelpohl, or shouted his frustration into the night. Had that been the only evidence, this would be a different case. But Harris heard Officer Vogelpohl say, "I'm going to issue you a ticket for being in the park after hours," so Harris knew Officer Vogelpohl intended to cite him. But Harris walked away from Officer Vogelpohl, necessitating a seven-minute foot pursuit. Five minutes into walking after Harris, Officer Vogelpohl called for a backup car. When the additional police cruiser arrived to stop Harris, Officer Vogelpohl ordered Harris to stop. Harris ran from the officers, and, after a brief chase, they had to physically restrain him. Harris did not merely refuse to cooperate; Harris engaged in the affirmative act of gathering his belongings and walking away when he knew that Officer Vogelpohl intended to detain him and issue him a ticket. Then, when ordered to stop a few minutes later, Harris ran. Viewing this evidence in the light most favorable to the prosecution, a trier of fact could reasonably conclude that Harris created a substantial stoppage by impeding Officer Vogelpohl from issuing the ticket while he followed Harris until Harris was arrested.

{**¶25**} Turning to whether Harris purposefully obstructed official business, a person acts "purposefully" when it is the person's "specific intention" to cause a certain result or engage in the prohibited conduct, regardless of what the person intends to accomplish by doing so. *See* R.C. 2901.22(A). "The purpose with which a person does an act is determined from the manner in which it is done, the means used, and all the

other facts and circumstances in evidence." *In re Payne* 1st Dist. Hamilton No. C-040705, 2005-Ohio-4849, at ¶ 15. A trier of fact must be able to reasonably infer from the nature of a person's conduct that the person intended his conduct to obstruct official business. *Id.*

{¶26} The record here supports an inference from the nature of Harris's conduct that Harris specifically intended to obstruct Officer Vogelpohl from issuing a ticket to Harris. The body-worn camera footage shows Officer Vogelpohl telling Harris he would receive a ticket and Harris responded by gathering his belongings and walking away. Harris continued walking away from Officer Vogelpohl for several minutes, and when a police car pulled in front of Harris to stop him, he ran. Viewing this evidence in the light most favorable to the prosecution, a reasonable factfinder could conclude that Harris affirmatively acted by walking away from Officer Vogelpohl. That reasonable factfinder could conclude that Harris impeded Officer Vogelpohl's performance of his police duties during the pursuit. From that conduct, a reasonable factfinder could infer that Harris specifically intended to avoid the ticket by walking and then running away from Officer Vogelpohl.

{¶27} Ultimately, the jury was presented with sufficient evidence that Harris committed an affirmative act that caused a substantial stoppage of Officer Vogelpohl's investigation and that Harris specifically intended to cause that result. We hold the jury did not lose its way and create a manifest miscarriage of justice when it found Harris guilty of obstruction of official business.

### IV. Criminal Trespass and Being in Washington Park After Hours

**{¶28}** Harris argues that his convictions for criminal trespass and being in Washington Park after hours were not supported by sufficient evidence and were contrary to the manifest weight of the evidence.

**{¶29}** The criminal trespass statute provides that "[n]o person, without privilege to do so, shall * * * [k]nowingly enter or remain on the land or premises of another." R.C. 2911.21(A)(1). Park Board Rule 21 provides that Washington Park, among other specified parks, "shall be closed to the public between 11:00 p.m. and 6:00 a.m. except for vehicular traffic on through roadways or vehicular or pedestrian traffic within, accessing, or exiting public parking garages directly connecting to city streets." Cincinnati Park Rule 21, https://www.cincinnati-oh.gov/cincyparks/visit-a-park/park-board-rules/ (accessed September 12, 2023). A violation of any Park Board Rule is punishable as a minor misdemeanor. Cincinnati Park Board Rule 39.

**{¶30}** Generally, "a person has a privilege to enter and be upon the public areas of public property." *State v. Shelton*, 63 Ohio App.3d 137, 578 N.E.2d 473 (4th Dist.1989). However, a person may commit a criminal trespass onto public property when his or her general privilege to be there has been properly revoked. A " 'public official or agency into whose charge the property is put can withdraw or revoke the privilege otherwise enjoyed by a member of the public.' " *Staley*, 1st Dist. Hamilton Nos. C-200270, C-200271 and C-200272, 2021-Ohio-3086, at ¶ 13, quoting *Dayton v. Moore*, 2d Dist. Montgomery No. 13369, 1993 Ohio App. LEXIS 1647 (Mar. 25, 1993).

**{¶31}** Here, the record establishes that 3CDC, the entity charged with managing Washington Park, set out three signs that display the hours that the park is

open. Outside of those hours, the signs notify members of the public that their privilege to be in Washington Park is revoked by Park Rule 21. While it is unclear from the record whether the signs state that Washington Park closes at 10:00 p.m. or 11:00 p.m., Harris was in the park at 4:45 a.m., well after either closing time and before the park opens at 6:00 a.m. Additionally, Officer Vogelpohl testified that on previous occasions, he had told Harris not to be in Washington Park when it is closed, also revoking Harris's privilege to be in Washington Park when it is closed. Officer Vogelpohl's body-worn camera recorded Harris shouting, "I'll be back at 6!" after he left the park. This statement demonstrates Harris knew the park opened at 6:00 a.m., that Harris was not currently permitted to be in the park, and that Harris would be permitted in the park when it was open.

{¶32} Harris contends he was passing through Washington Park, but Park Rule 21 only exempts "pedestrian traffic within, accessing, or exiting public parking garages." The rule does not generally exempt pedestrian traffic walking through the park. Harris does not argue he fell under the exception for accessing or exiting from a public parking garage. Even if he did argue the exception applied, the evidence suggests otherwise. Harris was stopped at the gazebo in the middle of the park, away from the access points to the parking garages or the routes from those access points to the street.

{¶33} Viewing the evidence presented in the light most favorable to the prosecution, a reasonable factfinder could determine that Harris was in the park between 11:00 p.m. and 6:00 a.m. and that the posted signs revoked Harris's privilege to be in the park. Thus, the finder of fact was presented with sufficient evidence to find Harris guilty of criminal trespass and being in the park after hours. Nor did the

finder of fact lose its way and create a manifest miscarriage of justice in finding Harris guilty of obstruction of official business.

## Conclusion

{¶34} Based on the foregoing reasoning, Harris's conviction for aggravated menacing was not contrary to the manifest weight of the evidence and Harris's convictions for obstructing official business, criminal trespass, and being in the park after hours each were supported by sufficient evidence and not contrary to the manifest weight of the evidence. This is not one of those "exceptional cases in which the evidence weighs heavily against the conviction" such that reversal on the basis of manifest weight is required. *See Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, (Cook, J., concurring), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶35} Accordingly, we overrule the assignment of error and affirm the judgments of the municipal court.

Judgments affirmed.

**CROUSE, P.J.,** and **BOCK, J.,** concur.

Please note:
    The court has recorded its entry on the date of the release of this opinion.