DECISION.
{¶ 1} While being arrested on a charge of disorderly conduct,[1] defendant-appellant Primas Glenn kicked and bit a Hamilton County Deputy Sheriff. A jury acquitted Glenn of the disorderly-conduct charge, but found Glenn guilty of resisting arrest,[2] a second-degree misdemeanor, and assault on a peace officer,[3] a fourth-degree felony. The trial court sentenced Glenn to eight months in prison for the assault and to 30 days in prison for resisting arrest, to be served concurrently. We affirm.
 {¶ 2} On December 2, 2002, Glenn and several members of his family were in the Hamilton County Courthouse. Glenn was there under subpoena to testify as a witness in his brother's trial for felonious assault. In the hallway outside of Judge Ruehlman's courtroom, Glenn and a woman, another witness in the trial, got into an altercation. A police officer intervened and separated Glenn and the woman, sending her into the courtroom and telling Glenn to stay in the hallway outside of the courtroom.
 {¶ 3} About five minutes later, Hamilton County Deputy Sheriffs Dale Wittmer and Don Maher responded to a call about a disturbance outside of Judge Ruehlman's courtroom. Deputy Wittmer testified that when he had arrived outside the courtroom, he had spoken with the woman involved in the altercation. The woman pointed to Glenn and his family and told Wittmer that Glenn had verbally and physically assaulted her, but that she did not want to press charges. Wittmer told the woman to stay away from Glenn and his family, and that he was going to tell Glenn and his family to stay away from her.
 {¶ 4} Wittmer then approached Glenn and asked to speak with him. Wittmer testified that he began by saying, "[E]vidently there was a problem up here." Wittmer testified that Glenn had become agitated and had loudly complained about how the woman was a problem to him and his family. Wittmer said that he had let Glenn "speak his piece." Wittmer then told Glenn and his family that all he wanted was for them to try to avoid any direct interaction with the woman involved in the altercation. Wittmer suggested that if they encountered her, they should walk the other way.
 {¶ 5} The family members all agreed that they would do so, but Glenn said he would not. Wittmer testified that Glenn had stated, "[M]y taxpayer money paid for this courthouse. I can do and say whatever I want here." Wittmer testified that Glenn had been "very angry and very loud at this point."
 {¶ 6} Wittmer decided that he needed to know Glenn's name, "in case later on we came back up, I know who I'm dealing with." He asked Glenn his name, and when Glenn gave it to him, Wittmer wrote it down on his hand. Wittmer then asked Glenn for his social security number. Glenn refused to give it to him. Wittmer then asked for a state identification card or driver's license. Glenn asked why the deputy needed it, and Wittmer responded that he wanted to match the name with the face on the identification, and if it matched, "we're good to go."
 {¶ 7} Glenn refused to give any identification to the deputy and said he would not cooperate. At that point, one of the female family members handed Glenn's identification card to Wittmer. Glenn turned to her and told her not to give the deputy anything and not to cooperate with him.
 {¶ 8} Wittmer then asked Glenn why he was in the courthouse. Glenn stated that he was subpoenaed, but that he did not have the subpoena with him. Wittmer testified that Glenn had been "pretty loud and pretty angry with me," and that "[h]e was drawing attention." Wittmer told Glenn that if he was not subpoenaed to be in the courthouse, he would be escorted out.
 {¶ 9} Wittmer testified, "[Glenn] said, you cannot escort me out. I said, yes, I can. Then he said, you're going to have to arrest me, punk. I said, excuse me? He said, well, you're just going to have to arrest me, punk." Wittmer told Glenn to calm down. But instead Glenn removed his coat and threw it on the ground, stepped close to Wittmer, and said, "[Y]ou need to go ahead and arrest me then, punk."
 {¶ 10} Wittmer then arrested and handcuffed Glenn. Wittmer testified that he had begun escorting Glenn down the hallway, but that Glenn had resisted by pulling back towards his family. Wittmer stated that he had needed to grab both of Glenn's arms and to use force to take him away.
 {¶ 11} According to Wittmer, Glenn then kicked him twice in the groin area. Wittmer testified that he had spun Glenn around and had taken him to the ground by taking his feet out from under him. Wittmer testified that as both men had fallen, "I put my hand out to catch my fall and his fall. I guess he kind of landed half on me, me on him. My arm was kind of underneath."
 {¶ 12} Wittmer testified that Glenn then had bitten him. Wittmer stated, "[A]ll I remember feeling is his stubble or facial hair on his face, him pinning my hand down onto the floor and then turning and biting. I mean it was within seconds." The state introduced into evidence two photographs taken immediately after the incident, showing a bloody cut on Wittmer's hand.
 {¶ 13} Hamilton County Deputy Sheriff Don Maher testified that the events had been similar to how Wittmer described them. Maher testified that Glenn "was refusing to cooperate, his voice, his tone, was escalating upward again. There was a point in time when he was refusing to give the information. He said: what are you going to do? Arrest me, punk. He got up in the deputy's face, took off his jacket, threw it down. At that point we had a very disorderly situation there." Maher testified that he had felt alarmed.
 {¶ 14} Maher watched as Wittmer arrested Glenn and began escorting him away. Maher testified that Glenn had resisted by holding back, and that Glenn had then kicked backwards several times towards Wittmer. Maher stated, "Deputy Wittmer took him straight to the ground, and within seconds Deputy Wittmer looked up to me and said he bit me."
 {¶ 15} Georgia Glenn Williams, Glenn's mother, testified that when Wittmer had asked Glenn for his social security number, Glenn had said that he did not have to give it to the deputy unless he was under arrest. According to her, Glenn asked if he was under arrest, but Wittmer responded, "[J]ust give me your number." Williams testified that Glenn had said, "If I'm under arrest, he put his hands behind him and said, arrest me." She testified that Glenn had never called the deputy a "punk," and that Glenn had not raised his voice.
 {¶ 16} Denise Glenn and Patricia Davis, Glenn's sisters, both testified that while Wittmer and Glenn talked, Glenn had repeatedly asked if he was under arrest, but that he had not called the deputy a "punk" and had not raised his voice. Denise Glenn testified that as he was being arrested, Glenn had handed his coat to his mother. She testified also that as Wittmer was leading Glenn away, Glenn had gotten his feet tangled up and had stumbled, and that Wittmer had grabbed him and had thrown him to the ground.
 {¶ 17} Gregory Essex, Glenn's brother-in-law, testified that when the deputy asked Glenn for his social security number, Glenn had asked if he was under arrest. According to Essex, the deputy made a comment, and Glenn put his hands behind his back and said to arrest him. Essex said that Glenn had not called the deputy a "punk" and had not raised his voice. Essex testified that Glenn had stumbled as the deputy led him away, and that the deputy had then slammed Glenn to the ground.
 {¶ 18} Glenn testified on his own behalf. He stated that when Deputy Wittmer asked him for his social security number, he had responded, "I'm not going to give you my social if you're not putting me under arrest." Asked why he was in the courthouse, Glenn told Wittmer that he was subpoenaed to be there. Wittmer told him that if he did not have any business in the courthouse, he was going to ask him to leave.
 {¶ 19} Glenn testified that he had decided to leave. He went to retrieve his coat and belongings from his family and said something. Wittmer followed him and asked him what he had said. Glenn testified, "I said he was doing some stupid stuff and that's why I was leaving. He said, you're under arrest." Glenn testified that he had put his hands behind his back, and Wittmer had handcuffed him and had begun to lead him away. According to Glenn, after two or three steps, Wittmer covered Glenn's mouth and nose with his right hand and slammed him to the ground. Glenn said that he had bitten Wittmer because he could not breathe for about 45 seconds. Glenn testified that he had never called Wittmer a "punk," and that he had not raised his voice.
 {¶ 20} Glenn now appeals, advancing two assignments of error. In his first assignment of error, he claims that his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence, and that the trial court erred when it denied his Crim.R. 29 motion for an acquittal. In his second assignment of error, he argues that he was prejudiced by ineffective assistance of counsel.
 A Lawful Arrest {¶ 21} At the close of the state's presentation of evidence, Glenn moved under Crim.R. 29 for an acquittal based on insufficient evidence on the disorderly-conduct and resisting-arrest charges. The court denied the motion. Glenn now claims that the trial court erred when it denied his Crim.R. 29 motion and when it convicted him for resisting arrest. Glenn argues that because his arrest for disorderly conduct was not a lawful arrest, he could not have been convicted of resisting arrest.
 {¶ 22} Whether the evidence is legally sufficient to sustain a verdict is a question of law.[4] We must determine whether any rational factfinder could have found the essential elements of the crime proved beyond a reasonable doubt.[5]
We must view the evidence in a light most favorable to the state, meaning in this case that we must accept the version of events proffered by Deputies Wittmer and Maher.[6]
 {¶ 23} The statute for resisting arrest states, "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another."[7] In a case for resisting arrest, the state does not need to prove that the defendant was guilty of the offense for which the arrest was made.[8] The statute merely requires that the arrest made be a lawful one. To be a lawful arrest, the arresting officer must have probable cause or a reasonable basis to believe that the offense for which the defendant has been arrested did, in fact, occur.[9]
 {¶ 24} The statute for disorderly conduct states, "No person shall recklessly cause inconvenience, annoyance, or alarm to another by doing any of the following: * * * Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person."[10] The state charged Glenn under the subsection that enhances the crime to a fourth-degree misdemeanor if "[t]he offender persists in disorderly conduct after reasonable warning or request to desist"[11] or if "[t]he offense is committed in the presence of any law enforcement officer, firefighter, rescuer, medical person, emergency medical services person, or other authorized person who is engaged in the person's duties at the scene of a fire, accident, disaster, riot, or emergency of any kind."[12]
 {¶ 25} The test for whether a defendant has inconvenienced, annoyed, or alarmed another is an objective one.[13] The question is whether, under the circumstances, it is probable that a reasonable person would have found the language and conduct annoying or alarming and would have been provoked to want to respond violently.[14]
 {¶ 26} Because the jury acquitted Glenn on the disorderly-conduct charge, the question is not whether the evidence supported a finding beyond a reasonable doubt that Glenn had committed disorderly conduct. The question is whether Wittmer had probable cause or a reasonable basis to believe that Glenn had committed disorderly conduct. That is, were the circumstances sufficiently strong to warrant a belief by Wittmer that a reasonable person would have found Glenn's language and conduct annoying or alarming and would have wanted to respond violently?[15]
 {¶ 27} The testimony of Deputies Wittmer and Maher was consistent. According to the deputies, Glenn became loud and angry when Wittmer asked him to avoid the woman with whom he had previously had an argument. Glenn refused to give Wittmer his social security number and did not let his mother give his identification to the deputy. When Wittmer told Glenn that if he did not have a subpoena to be in the courthouse, he would be escorted out, Glenn became confrontational, stating that Wittmer would have to arrest him. Both Wittmer and Maher testified that Glenn had been loud and angry. Maher testified that he had been alarmed and concerned that the situation would escalate. Even though Wittmer responded by telling Glenn to calm down, Glenn continued to challenge the deputy, threw his coat down, stepped close to Wittmer, and said, "[Y]ou need to go ahead and arrest me then, punk."
 {¶ 28} We acknowledge that a police officer must tolerate a certain level of verbal abuse from citizens. But given that the incident took place in a public courthouse, we conclude that Deputy Wittmer had a reasonable basis to believe that he needed to arrest Glenn to maintain control of the situation, and that he had a reasonable basis to believe that Glenn had committed disorderly conduct. Therefore, Wittmer's arrest of Glenn was a lawful arrest. Given that the arrest was lawful, we conclude that a rational factfinder could have found beyond a reasonable doubt that when Glenn had refused to move after being handcuffed, had kicked Wittmer, and had bitten his hand, Glenn had committed the crime of resisting arrest.
 {¶ 29} Therefore, there was sufficient evidence to support the court's denial of Glenn's Crim.R. 29 motion and his conviction for resisting arrest.
 Assault and Manifest Weight {¶ 30} Glenn also challenges the sufficiency of evidence for his conviction for assault on a peace officer. The assault statute states in relevant part, "No person shall knowingly cause or attempt to cause physical harm to another * * *."[16]
Because the victim was a peace officer, the state charged Glenn with a fourth-degree felony.[17]
 {¶ 31} Wittmer testified that he had arrested Glenn, had handcuffed him, and had begun to lead him away when Glenn kicked him twice. Both men fell to the ground, and Glenn bit Wittmer's hand. Viewing the evidence in a light most favorable to the state, we conclude that a rational factfinder could have found beyond a reasonable doubt that Glenn had committed the offense of assault on a peace officer. Therefore, we hold that there was sufficient evidence to support Glenn's conviction for assault.
 {¶ 32} Finally, Glenn argues that both of his convictions were against the manifest weight of the evidence. A challenge to the weight of the evidence attacks the credibility of the evidence presented.[18] When evaluating the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.[19]
The discretionary power to reverse should be invoked only in exceptional cases "where the evidence weighs heavily against the conviction."[20]
 {¶ 33} Both Deputy Wittmer and Deputy Maher testified that Glenn had not willingly walked down the hallway after being handcuffed, but instead had tried to remain standing near his family. Wittmer testified that Glenn had kicked him twice in the groin, and Maher testified that he had seen Glenn kick Wittmer. Wittmer testified that Glenn had bitten his hand.
 {¶ 34} Glenn's sister and brother-in-law testified that as Wittmer had begun leading Glenn away after arresting him, Glenn had stumbled and Wittmer had thrown him to the ground. Glenn testified that he had not kicked Wittmer, but that Wittmer had suddenly covered his mouth and nose and had slammed him to the ground. Glenn testified that because he could not breathe, he had bitten Wittmer's hand.
 {¶ 35} While it was provided with conflicting versions about what happened, the jury was free to believe some, all, or none of a particular witness's testimony. Our review of the record does not persuade us that the jury clearly lost its way or created a manifest miscarriage of justice in finding Glenn guilty of resisting arrest and assault on a peace officer. Therefore, the convictions were not against the manifest weight of the evidence.
 {¶ 36} Accordingly, we overrule Glenn's first assignment of error.
 Ineffective Assistance of Counsel {¶ 37} In his second assignment of error, Glenn argues that he was denied the effective assistance of counsel. To establish ineffective assistance of counsel, Glenn must demonstrate that his counsel's performance fell below an objective standard of reasonable competence, and that there was a reasonable probability that, but for such deficiency, the outcome of the trial would have been different.[21] Judicial scrutiny of counsel's performance must be highly deferential.[22] A court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.[23]
 {¶ 38} Glenn cites two specific examples of how his counsel's ineffectiveness prejudiced him during his trial. First, Glenn argues that his counsel should have introduced evidence of law-enforcement training procedures to show that Deputy Wittmer had not handled Glenn appropriately when arresting him. Glenn argues that such evidence would have shown that Wittmer caused or at least contributed to his own injury.
 {¶ 39} Glenn's counsel could have decided to discuss standard arrest procedures, but chose not to. We believe that this was a decision of trial strategy on counsel's part.
 {¶ 40} In addition, even if the jury had believed Glenn's version of the incident — that Wittmer had caused Glenn to stumble and then had attempted to smother him while they were both on the ground — evidence concerning how a police officer should make a proper arrest would not have changed the trial's outcome. Such action by a police officer would not have been proper or standard arrest procedure. And if, as the verdicts demonstrate, the jury did not believe Glenn's version of the incident, evidence concerning proper arrest procedures would not have changed the outcome of the trial.
 {¶ 41} Glenn's second example of ineffective counsel is that his counsel did not object when the prosecution repeatedly stated that Glenn's brother had been, at the time of Glenn's offenses, on trial for felonious assault. Glenn claims that the jury was led to believe that Glenn was guilty by association.
 {¶ 42} Reviewing the record, we note that defense counsel was the first to mention that Glenn's brother was a criminal defendant in the courthouse that day. Again, counsel's decision to speak openly about Glenn's brother's criminal trial and counsel's choice not to object when the state mentioned it were examples of trial strategy and were not the types of decisions that would have affected the outcome of the case. The jury was given sufficient evidence to conclude beyond a reasonable doubt that Glenn had resisted arrest and had assaulted a peace officer. We deem it highly unlikely that if the one fact concerning Glenn's brother had been omitted, the jury would have reached a different conclusion.
 {¶ 43} Therefore, we conclude that Glenn was not prejudiced by his counsel's alleged ineffectiveness. Accordingly, we overrule his second assignment of error and affirm Glenn's convictions.
Judgment affirmed.
Winkler, P.J., and Sundermann, J., concur.
[1] R.C. 2917.11(A)(2).
[2] R.C. 2921.33(A).
[3] R.C. 2903.13(A).
[4] See State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541.
[5] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus.
[6] Id.
[7] R.C. 2921.33(A).
[8] See State v. Mann (1985), 19 Ohio St.3d 34, 38-39,482 N.E.2d 592.
[9] See State v. Rose (1991), 75 Ohio App.3d 656, 658,600 N.E.2d 382; Elyria v. Meszes (Mar. 2, 1994), 9th Dist. No. 93CA005623.
[10] R.C. 2917.11(A)(2).
[11] R.C. 2917.11(E)(3)(a).
[12] R.C. 2917.11(E)(3)(c).
[13] See State v. Johnson (1982), 6 Ohio App.3d 56, 57,453 N.E.2d 1101.
[14] See id.; State v. Hoffman (1979), 57 Ohio St.2d 129,387 N.E.2d 239, paragraph one of the syllabus; State v. Lorenzo, 11th Dist. No. 2001-L-053, 2002-Ohio-3495, at ¶ 28.
[15] See State v. Rose, supra, at 659.
[16] R.C. 2903.13(A).
[17] R.C. 2903.13(C)(3).
[18] See State v. Thompkins, supra, at 387.
[19] See id.; State v. Martin (1983), 20 Ohio App.3d 172,175, 485 N.E.2d 717.
[20] See State v. Martin, supra.
[21] See Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052; State v. Bradley (1989), 42 Ohio St.3d 136,538 N.E.2d 373, paragraphs two and three of the syllabus.
[22] See Strickland v. Washington, supra, at 689; State v.Bradley, supra, at 142.
[23] Id.