[Cite as *State v. Chambers*, 2025-Ohio-4737.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240578 |
| | | TRIAL NOS. 24/CRB/9650/B/C |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *JUDGMENT ENTRY* |
| JAYLIN CHAMBERS, | : | |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgments of the trial court are affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate be sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 10/15/2025 per order of the court.**


**By:**_____
        **Administrative Judge**

[Cite as *State v. Chambers*, 2025-Ohio-4737.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240578 |
| | | TRIAL NOS. 24/CRB/9650/B/C |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| JAYLIN CHAMBERS, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: October 15, 2025

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Phoebe Cates*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Michael J. Trapp*, for Defendant-Appellant.

**CROUSE, Presiding Judge.**

{¶1}     Police responded to a domestic-violence call involving defendant-appellant Jaylin Chambers and an alleged victim, D.K. While the officers attempted to investigate the call, Chambers refused to take a seat and began shouting at and over officers, hurling curses both at them and D.K. When officers sought to restrain him, he fought. He now challenges the sufficiency of the evidence supporting his convictions for obstructing official business and resisting arrest.

{¶2}     We hold that the State's evidence was legally sufficient to support the trial court's findings underlying Chambers's convictions for obstructing official business under R.C. 2921.31 and for resisting arrest under R.C. 2921.33. Accordingly, we affirm.

## I. BACKGROUND

### A. Arrest

{¶3}     In June 2024, Cincinnati Police Officers Corey Bender and Zach Mitchell responded to a domestic-violence call. Upon arrival, the officers encountered D.K. and Chambers, the alleged perpetrator of the domestic-violence incident. Chambers was apparently "sitting in the grass area next to the apartment complex" acting "pretty upset." The officers decided to split the two up and speak with them separately. Officer Bender spoke with Chambers, and Officer Mitchell spoke with D.K. Officer Bender testified that Chambers was cooperative during this period.

{¶4}     Officer Bender testified that, because he wished neither to handcuff Chambers nor to place him in the police vehicle, he asked Chambers to sit on the sidewalk near the car. Chambers, however, refused to take a seat on the curb. As the encounter went on, Chambers "became more and more upset" and began to protest "that he wasn't going to jail." Officer Bender speculated that Chambers's agitation may

have increased because D.K., who had been pulled to the side, "came into sight" around this time.

{¶5} The events from this point forward were captured on video recorded by officers' body-worn cameras ("BWCs"), which the State played at trial. The video shows Chambers protesting after being asked to sit down and asserting that he won't go to jail. Chambers then begins to shout and curse at D.K., who is somewhere off-camera, behind Officer Mitchell. Officer Mitchell takes a few steps toward Chambers. As he does so, Chambers walks backwards, keeping a roughly consistent space between himself and the officers, shouting and gesticulating all the while.

{¶6} Then Chambers changes direction. He takes a couple of steps in Officer Mitchell's direction, but slightly to the officer's side, as he continues to look and yell at D.K. off-camera. As Chambers comes even with Officer Mitchell, Mitchell grabs both his arms. Chambers's voice rises as he attempts to pull free, shouting, "Nah, I ain't goin' to no—cuz—bruh! What you doin', bruh? Man—what y'all doin', bruh?"

{¶7} Within seconds, Officer Mitchell wrestles a still-writhing, still-shouting Chambers to the grass, and Officer Bender joins Officer Mitchell in restraining Chambers's limbs against the ground. Officer Bender then turns Chambers onto his stomach to put handcuffs on him, while Officer Mitchell rises to interpose himself between D.K., who has run over to protest the officers' sudden use of physical force to subdue Chambers, and the pair still struggling on the ground. Eventually, Chambers is handcuffed and taken to the police cruiser. At no point during the recorded encounter do the officers tell Chambers he is under arrest.

### B. Trial

{¶8} Later that day, Officers Bender and Mitchell filed three complaints against Chambers in the Hamilton County Municipal Court. The first complaint

4

("Count A") charged Chambers with domestic violence under R.C. 2919.25, a first-degree misdemeanor. The second ("Count B") charged him with obstructing official business ("OOB") in violation of R.C. 2921.31, a second-degree misdemeanor. And the third ("Count C") charged Chambers with resisting a lawful arrest by force, in violation of R.C. 2921.33, another second-degree misdemeanor.

{¶9} Chambers maintained his not-guilty plea on all three counts. Count A was dismissed for want of prosecution. Counts B and C proceeded to a bench trial.

{¶10} The evidence at trial consisted of the BWC footage and the testimony of Officers Bender and Mitchell. The officers testified that they had not intended to take Chambers into custody when they first arrived and asked him to sit on the sidewalk. Officer Bender testified he had later sought to handcuff and detain Chambers because of his aggressive shouting and noncompliance:

> He wasn't listening. He was yelling over the top of my partner and I who were trying to calm him down. He was more worried about yelling at the victim.
>
> And his statements and the way he was conducting himself, at that point in time I made the decision, my partner and I, to put him into handcuffs so we could actually further investigate what we were there to do.

Officer Bender explained that even then, he was only "trying to speak to [Chambers] and place him into handcuffs just to detain him." It was only when Chambers "began pulling away" that "he was . . . under arrest."

{¶11} Officer Mitchell testified that he had intended to place Chambers in cuffs when he started "making physical evasive movement," i.e., when Mitchell saw Chambers "backing up" and "flailing his arms stating he wasn't going to jail." At that

point, Mitchell said, the officers "went to detain him based off of those movements and he resisted immediately," including by "instantly pull[ing] his left arm away from" Officer Mitchell's grasp. This resistance, Mitchell said, "requir[ed] [the officers] to place him on the ground for a better handcuffing position."

{¶12} Both officers acknowledged that they never told Chambers he was under arrest. Indeed, Officer Bender testified that he had "repeatedly" told Chambers, prior to the incident, "that he [was] not under arrest" and that he was "not going to place him in cuffs." According to Bender, once Chambers pulled away and the officers decided to arrest him, they "didn't have time to tell [Chambers] that he was under arrest because [they] were fighting with him." Bender testified that Chambers was ultimately "arrested for obstruction and resisting."

{¶13} During both his motion for acquittal and closing argument, Chambers argued that, on the OOB charge, any obstruction that might have resulted from Chambers's actions did not cause the "substantial stoppage" necessary to convict. And on the resisting count, Chambers contended that the officers had lacked probable cause to arrest him, and that he hadn't known he was under arrest—in part because officers had "repeatedly told" him he wasn't. In rebuttal, the State reiterated that Chambers had been loud and obnoxious, had refused to cooperate, and had moved away from officers, which had led to his arrest for OOB and subsequent resistance to that arrest.

{¶14} Ultimately, the trial court said that it "saw some affirmative acts of refusing to sit down and backing away coupled with I am not going to jail, cursing, combative." It therefore found Chambers "[g]uilty on the obstruction," and "[g]uilty on the refusing [sic] because it was a lawful arrest." The trial court sentenced Chambers to two days' incarceration, but credited Chambers for the two nights he'd

already spent in jail. This appeal timely followed.

## II. MOOTNESS

{¶15} In its brief, the State contends that Chambers's appeal is moot. In general, a misdemeanor appeal becomes moot only if the defendant (1) has voluntarily served their full sentence and (2) cannot show that they suffer any lingering collateral disabilities or loss of civil rights from their conviction. *See State v. Coffman*, 2024-Ohio-1182, ¶ 8 (1st Dist.), citing *State v. Ekouevi*, 2023-Ohio-703, ¶ 4 (1st Dist.).

{¶16} An appellant generally shows that their sentence was not served voluntarily by pointing to their request for a stay of that sentence. *See Cleveland Hts. v. Lewis*, 2011-Ohio-2673, ¶ 23. However, in *Coffman* we held that a misdemeanant who is sentenced only to the time he involuntarily served *prior to trial* need not seek a stay to preserve his right of appeal. *Coffman* at ¶ 9-10. We explained that "by the time the trial court sentenced [such a defendant], he ha[s] already involuntarily served his entire sentence," so no further proof of involuntariness is needed. *Id.* at ¶ 9.

{¶17} Here, Chambers spent two days in jail prior to trial, was convicted, and was sentenced to the two days he had already served. Like Coffman, Chambers thus "served his [two]-day sentence involuntarily," so "his appeal is not moot." *Id.* at ¶ 10.

## III. SUFFICIENCY CHALLENGES

{¶18} Chambers's two assignments of error challenge the sufficiency of the evidence supporting his convictions for OOB and resisting arrest, respectively. A challenge to the sufficiency of the evidence is, in essence, an allegation that the State failed to meet its burden of production. *See State v. Messenger*, 2022-Ohio-4562, ¶ 26; *State v. Walker*, 2025-Ohio-2982, ¶ 11 (1st Dist.). To resolve such a challenge, we ask whether the State's evidence, if believed and taken in the light most favorable to the State, could have satisfied all the elements the State had to prove to secure a

conviction. *See State v. Jones*, 2021-Ohio-3311, ¶ 16; *Walker* at ¶ 11.

### A. Obstructing Official Business

{¶19} In his first assignment of error, Chambers contends that the State's evidence was insufficient to convict him of OOB under R.C. 2921.31(A), which provides as follows:

> No person, without privilege to do so and with purpose to prevent, obstruct, or delay the performance by a public official of any authorized act within the public official's official capacity, shall do any act that hampers or impedes a public official in the performance of the public official's lawful duties.

{¶20} This court has previously explained that, to convict a defendant under this statute, the State must show and the trier of fact must find (1) that the defendant performed an *affirmative act*, (2) that the defendant was *not privileged* so to act, (3) that the defendant acted with a *purpose to prevent, obstruct, or delay* a public official in performing an authorized act within their duties, and (4) that the defendant's alleged action ultimately *hampered or impeded a public official* in performing their duties. *See Walker* at ¶ 13, citing *In re Payne*, 2005-Ohio-4849, ¶ 11 (1st Dist.). Because Chambers's arguments do not address privilege, neither do we.

### 1. Affirmative Act & Obstructive Purpose

#### a.

{¶21} The first element of OOB requires the State prove the defendant engaged in some "affirmative act." We have held that an affirmative act must be something more than a "defendant's refusal to comply with a police officer's order." *Coffman*, 2024-Ohio-1182, at ¶ 15 (1st Dist.). Rather, "the proper focus in a prosecution for obstructing official business is on the total course of the defendant's

*conduct*, verbal and physical." (Emphasis added.) *State v. Buttram*, 2020-Ohio-2709, ¶ 12 (1st Dist.), citing *State v. Wellman*, 2007-Ohio-2953, ¶ 12 (1st Dist.).

**{¶22}** The third element of OOB requires the State to prove that these affirmative acts were undertaken with the purpose to prevent, obstruct, or delay public officials in the execution of their duties. The State must prove "not merely that the defendant intended to engage in the charged obstructive conduct, but that the defendant did so with the 'specific intention to cause a certain result,'" i.e., obstruction or delay of an official performing their duties. *Walker*, 2025-Ohio-2982, at ¶ 16 (1st Dist.), quoting R.C. 2901.22(A).

**{¶23}** As the State correctly points out, we generally assess an OOB conviction by considering "'the totality of the defendant's conduct,'" rather than viewing each act in total isolation. *See State v. Hammock*, 2024-Ohio-2149, ¶ 17 (1st Dist.), quoting *State v. Easterling*, 2019-Ohio-2470, ¶ 35 (2d Dist.). However, this totality analysis cannot be used to criminalize conduct undertaken without the requisite "purpose to prevent, obstruct, or delay."

**{¶24}** In this case, the State points to numerous alleged affirmative acts, describing how Chambers "[1] backed away, [2] flailed his arms, [3] told officers that he was not going to jail, [4] gave pre-flight indicators, [5] yelled over the police officers, [6] stepped in the direction of [D.K.], and [7] cursed." Although this list includes both verbal and nonverbal conduct, the crux of the State's obstruction argument is that "the totality of the circumstances established Defendant *yelling over the officers* and *cursing* hampered and obstructed the officers in their ability to conduct their investigation." In other words, the "affirmative acts" that the State claims obstructed the officers' performance of their duties all involved forms of *speech*. Whether and how we can consider these verbal acts under the OOB statute raises unique questions.

b.

{¶25} Chambers argues that his "words are shielded from prosecution by the First Amendment to the U.S. Constitution."[1] That amendment, enforceable against Ohio by virtue of the Fourteenth, prohibits the State from "abridging the freedom of speech." U.S. Const., amend. I. Thus, Chambers contends, his aggravated shouts and curses cannot be affirmative acts proscribed by the OOB statute.

{¶26} We disagree. For at least the past 30 years, this and other Ohio courts have rejected an interpretation of R.C. 2921.31(A) that categorically excludes speech. *See State v. Lazzaro*, 1996-Ohio-397, ¶ 23 (allowing OOB prosecution for making false statements to investigating officer); *State v. Jeter*, 2005-Ohio-1872, ¶ 15 (1st Dist.) (allowing OOB prosecution for making statements that identified undercover police officer to suspect). But just because speech can be an affirmative act under the OOB statute, doesn't mean the First Amendment has no role to play.

{¶27} As we have recognized, "we must be extremely careful when punishing mere words" under the OOB statute. *Jeter* at ¶ 15. The United States Supreme Court has subjected obstruction statutes to searching First Amendment scrutiny in the past. In *Houston v. Hill*, 482 U.S. 451, 461 (1987), the Court struck down a law-enforcement-obstruction ordinance that applied to speech, partly because "the First Amendment protects a significant amount of verbal criticism and challenge directed at police officers," even while the officers are engaged in their duties. And in *Lewis v.*

---

[1] We note that this constitutional argument was not raised before the trial court. The complaint did not allege that Chambers's OOB charge was based on his speech but rather stated that the charge was based on "[t]he defendant walking away from officers while officers gave multiple commands to stop." Much of the State's case thus focused on the defendant's decision to walk away and his refusal to sit down. Ultimately, the court below found Chambers guilty in part due to his speech. We are unsure of whether Chambers had an opportunity to address this issue below. The state has not argued waiver and, in fact, substantively addressed Chambers's First Amendment argument in its brief. Because waiver in this case is questionable and raises a complex issue not addressed by the parties, we take the parties' lead and address the First Amendment argument.

*New Orleans*, 415 U.S. 130, 132 and 134 (1974), the Court held that an ordinance banning the use of "'obscene or opprobrious language toward or with reference to [an officer] while in the actual performance of his duty'" violated the First Amendment because it was overbroad and "susceptible of application to protected speech." Thus, a construction of R.C. 2921.31(A) that criminalized speech merely because it made officers' lives more difficult or irksome would raise serious constitutional concerns.

**{¶28}** What saves the OOB statute from such a constitutionally-suspect construction is its specific-intent requirement. To be convicted of OOB, the defendant must have *specifically intended* to cause an obstruction or delay. *See State v. Harris*, 2023-Ohio-4387, ¶ 26 (1st Dist.) (upholding OOB conviction because "a reasonable factfinder could infer that Harris *specifically intended* to avoid the ticket by walking and then running away" (Emphasis added.)); *see also State v. Thompson*, 2024-Ohio-3165, ¶ 23 (1st Dist.) (noting that a defendant accused of OOB acts "purposely when the person intends to cause a specific result"). Thus, to reconcile the tension between the OOB statute and a defendant's right of expression, this court has emphasized that a defendant's speech is "sufficient to satisfy the 'act' element" of the OOB statute *only where* the State also proves it "was done for the purpose of impeding an officer in the performance of his duty." *In re Payne*, 2005-Ohio-4849, at ¶ 14 (1st Dist.).

**{¶29}** Because purpose goes to the defendant's subjective mental state, it must nearly always be proved circumstantially. *See id.* at ¶ 15. In the context of a defendant who runs from police, for example, we have said evidence of a "defendant's knowledge that an officer is attempting to detain them, plus the willful choice to run away" is legally sufficient to support an inference that the defendant fled with "purpose to prevent, obstruct, or delay the officer." *Walker*, 2025-Ohio-2982, at ¶ 17 (1st Dist.);

11

*accord Thompson* at ¶ 25; *Harris* at ¶ 26; *Coffman*, 2024-Ohio-1182, at ¶ 19 (1st Dist.). This inference rests on the commonsense conclusion that, when a defendant knows an officer wishes to detain him and runs anyway, he nearly always does so in order to "prevent, obstruct, or delay" the officer's attempts to capture him. Because, in the absence of additional complicating facts, any other motivation would be highly unexpected, the State need show no more to sustain a finding of purpose.

{¶30} But the same knowledge-plus-choice framework cannot be translated to contexts in which the defendant's affirmative act is speech. Speakers regularly choose to communicate their views *in spite of* their speech's likely harms, rather than because of them. Proof that a defendant intended to speak, even coupled with proof the defendant understood the likely or certain obstructive outcome, cannot alone suffice to show that the defendant's *purpose* in speaking was merely to obstruct. Without more, an inference of obstructive purpose would be, at best, speculative. *See In re Payne* at ¶ 15 ("Where a defendant's conduct is limited to truthful speech, one cannot reasonably infer intent to obstruct official business unless the circumstantial evidence clearly demonstrates such intent.").

{¶31} In certain cases, the circumstances or content of the speech itself can serve to make the obstructive intent apparent. For example, the Ohio Supreme Court has held that the OOB statute applies to a defendant who deliberately makes a false statement to the police regarding an investigation. *Lazzaro*, 1996-Ohio-397, at ¶ 23. In so doing, the Court held that the "trier of fact could reasonably conclude," based on the evidence of the defendant's knowingly false statements, that she "intended to mislead and impede the [police's] investigation." *Id*. at ¶ 22. And this court has upheld an OOB conviction of a defendant who shouted to warn another suspect that his interlocutor was an undercover police officer. *Jeter*, 2005-Ohio-1872, at ¶ 15 (1st

Dist.). Although *Jeter* focused on the "affirmative act" and "hampered or impeded" elements, the court clearly believed that, given the circumstances, the defendant's shouted warning could have had but one purpose: thwarting the undercover officer's sting operation. *See id*. at ¶ 21-22 (discussing danger posed by an individual who blows an officer's cover).

**{¶32}** In most speech-based OOB cases, however, the content and circumstances render it at least plausible—if not likely—that the speaker wanted to use their words as more than mere tools for obstruction. A defendant surely *knows* that arguing with police officers is likely to cause them delay, yet we have squarely held that conduct "limited to arguing with the police officers" does "not rise to the level from which the requisite intent [can] be inferred." *In re Payne*, 2005-Ohio-4849, at ¶ 17 (1st Dist.); *see also Harris*, 2023-Ohio-4387, at ¶ 24 (1st Dist.). In such cases, the State must offer more to justify an inference of obstructive intent.

**{¶33}** A survey of the cases—especially those concerning OOB prosecutions for shouting at or arguing with police officers—suggests that this "something more" is usually evidence of the defendant's own contemporaneous conduct suggestive of the defendant's broader purpose to obstruct officials. While we do not purport to offer any comprehensive list of the sorts of conduct that might support such an inference, the cases do provide certain repeating fact patterns in which a court might infer the defendant's verbal conduct stepped over the "'crossing point'" and became something "'beyond mere argument.'" *See In re Payne* at ¶ 16, quoting *State v. Stayton*, 126 Ohio App.3d 158, 164 (1st Dist. 1998).

**{¶34}** Sometimes, a defendant's movements and gestures while addressing argumentative words to an officer will unambiguously indicate their purpose to obstruct. For example, a defendant who gets "nose-to-nose" with an officer and

13

cautions the officer not to "f---- with him" demonstrates, by his positioning and tone, that his words served the specific purpose of preventing officers from doing their jobs. *See Maple Hts. v. Draves*, 1996 Ohio App. LEXIS 3180, *6 (8th Dist. July 25, 1996).

**{¶35}** Sometimes, however, the State relies on evidence of a defendant's other noncompliant behaviors that, while not themselves punishable, form part of a single course of conduct with the defendant's aggressive or argumentative speech. The cases involving belligerent words coupled with failures to identify upon request provide good examples. An individual's refusal to identify themselves is not an "affirmative act" punishable as OOB. *See State v. Grice*, 2009-Ohio-372, ¶ 9 (1st Dist.). Yet, in some cases, courts have upheld OOB convictions for defendants who have failed to identify themselves *and* engaged in aggressive or argumentative speech with the officers. *See, e.g., Wellman*, 2007-Ohio-2953, at ¶ 13 (1st Dist.) (defendant also departed despite request to stay); *N. Ridgeville v. Reichbaum*, 112 Ohio App.3d 79, 84 (9th Dist. 1996) (upholding OOB conviction of defendant for not producing identification, shouting, and repeatedly answering police questions posed to a different individual, despite several warnings); *Dayton v. Turic*, 2005-Ohio-131, ¶ 25-26 (2d Dist.) (defendant guilty of OOB after acting belligerently toward an officer trying to investigate an altercation defendant had participated in, refusing to identify herself to the officer, and refusing to halt when instructed). In effect, the defendant's failure to identify themselves can be taken as circumstantial evidence, from which a reasonable factfinder *could* (but need not) infer that the defendant's verbal aggression had an obstructive purpose. *See Wellman* at ¶ 15-16 (trier of fact could infer from defendant's surrounding conduct that his speech, while true, was for the purpose of impeding officers).

**{¶36}** A similar line of cases concerns defendants whose aggressive speech was

coupled with their refusal to comply with officers' legitimate instructions to leave a place or vehicle. Failure to obey a command is not itself an "affirmative act" punishable as OOB. *See Coffman*, 2024-Ohio-1182, at ¶ 15 (1st Dist.). Nevertheless, an unprivileged refusal to cooperate *may be evidence* that a defendant's combative colloquies involved a purpose to obstruct. *See*, *e.g.*, *State v. Cossack*, 2005-Ohio-965, ¶ 87 (7th Dist.) (defendant who "shouted expletives," refused to go back in his garage, and "tried to prevent [officers] from issuing [parking] tickets" could be convicted of OOB); *State v. Henry*, 2018-Ohio-1128, ¶ 58 (10th Dist.) (upholding OOB conviction where "the state presented evidence appellant became argumentative, yelled at BMV agency employees, pointed his finger in the face of an employee, refused the officer's requests to calm down and to leave the building, pushed the officer and resisted the officer's attempt to remove him from the agency"); *State v. Gannon*, 2020-Ohio-3075, ¶ 15 (9th Dist.) (affirming OOB conviction where defendant "created the delay by repeatedly refusing the officers' commands while making obscene gestures and shouting expletives" and, "[m]ost significantly, . . . physically resisted [the officer's] attempt to pull him out of the vehicle").

{¶37} Though not all of these cases expressly address the question we now consider, their facts and outcomes are consistent with the principle we set forth today: to sustain an OOB conviction based on a defendant's speech, the State must put forth evidence of circumstances or actions tending to show that the defendant, when they chose to speak, had *more than mere knowledge* their words would obstruct, impede, or delay an official. A lack of circumstantial evidence demonstrating the defendant's obstructive *purpose* renders the State's case legally insufficient.

c.

{¶38} Turning to Chambers's case, we conclude that the State's evidence was

legally sufficient to support the trial court's inference that Chambers shouted and yelled for the purpose of delaying or impeding the officers.

{¶39} Chambers's shouting and cursing alone cannot prove his intent to obstruct. *See In re Payne*, 2005-Ohio-4849, at ¶ 17 (1st Dist.). At least some of Chambers's shouting evinced anger and displeasure with the police's investigation and his detention—sentiments that could be consistent with purely expressive activity.

{¶40} But the State also adduced evidence of Chambers's repeated refusals to sit on the curb when told to do so and attempts to distance himself from the officer approaching him. Neither of these acts were, on their own, grounds for an OOB conviction: his refusal to sit upon command was not an affirmative act, and his few steps backward, even if purposeful, hardly hampered or impeded the officers in any substantial way. But both actions tended to show that Chambers wished to make officers' efforts to investigate and get the situation under control more difficult. This evidence, in turn, could support an inference that Chambers's shouting and arguing also stemmed from a desire to make it difficult, if not impossible, for the officers to speak to D.K. and to investigate the domestic violence allegation against Chambers.

{¶41} These corroborating acts cast this case in the mold of cases like *Turic*, 2005-Ohio-131, at ¶ 25-26 (2d Dist.), where the defendant's intent to use belligerent speech to impede officers could be inferred from her refusal to halt or to identify herself upon request when officers were attempting to investigate an altercation in which she had been involved. And it distinguishes this case from cases like *In re Payne* at ¶ 7-9, in which the defendant's argumentative speech predictably made the officers' job more difficult, but the defendant was otherwise generally compliant.

{¶42} The State's evidence of Chambers's other noncompliant actions, coupled with his willful decision to shout and argue in a manner that predictably

16

caused the situation to deteriorate, was legally sufficient to permit an inference that Chambers shouted and cursed with a "purpose to prevent, obstruct, or delay" the officers' ongoing investigation and attempts to secure the scene. *See* R.C. 2921.31(A). The trial court's finding to that effect was therefore supported by sufficient evidence.

### 2. *"Hampers or Impedes"*

**{¶43}** Chambers also contends that, even if he acted with the purpose to obstruct, impede, or delay the officers, the State failed to show that his actions in fact "hamper[ed] or impede[d]" them in the performance of their duties. We have held that, to prove a defendant hampered or impeded an official in the performance of their duties, the State must show that the defendant's actions caused a "'substantial stoppage' of the officer's progress." *See In re R.B.*, 2021-Ohio-3749, ¶ 18 (1st Dist.).

### a.

**{¶44}** Before turning to the merits of Chambers's sufficiency argument, we address the State's request that we discard our "substantial stoppage" standard and "evaluate the hamper or impede element based on the plain language of the statute." Because the "substantial stoppage" standard *is* rooted in the statute's language, we decline the State's invitation to cast aside nearly a half century of precedent.

**{¶45}** The OOB statute criminalizes only conduct that "hampers or impedes a public official" in performing their job. R.C. 2921.31(A). Because this language is included *in addition* to the specific-intent requirement (that the defendant have a "purpose to prevent, obstruct, or delay" official action), it must impose some independent requirement. However, the statute nowhere defines what it means to "hamper[] or impede[]" an official. Thus, nearly fifty years ago, this court did what courts often do: it looked to dictionaries to determine the content and connotation of "hamper" and "impede." *See State v. Stephens*, 57 Ohio App.2d 229, 230 (1st Dist.

17

1978). We concluded that the terms conveyed that the defendant must have effected some "substantial stoppage." *Id.* Anything less would have failed to give effect to the minimum threshold implied by the legislature's choice to limit prosecutions to cases where action "hampers" and "impedes," rather than permit prosecutions for *any* actions undertaken with obstructive intent, regardless of impact.

{¶46} The "substantial stoppage" standard thus arose from this court's effort to give effect to the legislature's choice of words, not supplant them. We have applied this principle in reviewing convictions under the statute across the intervening decades. *See*, *e.g.*, *State v. Dunn*, 1980 Ohio App. LEXIS 11877, *4 (1st Dist. Mar. 26, 1980); *Wellman*, 2007-Ohio-2953, at ¶ 17 (1st Dist.); *In re R.B.*, 2021-Ohio-3749, at ¶ 18 (1st Dist.); *Coffman*, 2024-Ohio-1182, at ¶ 22 (1st Dist.). By exposition in these and other cases, the standard has crystallized as a tool for discerning when a defendant's conduct rises to the level of hampering or impeding officers. *See Stephens* at 230; *Coffman* at ¶ 22.

{¶47} We have often reiterated, however, that the substantial-stoppage standard should not be divorced from the statute's text. It serves only as a guidepost, and if "the record demonstrates that the defendant's act hampered or impeded the officer in the performance of his duties, the evidence supports the conviction." *Wellman* at ¶ 18; *accord Coffman* at ¶ 22; *State v. Schoemaker*, 2015-Ohio-4645, ¶ 15 (1st Dist.). Proving "substantial stoppage" does not require the State to prove the defendant actually prevented the official from engaging in their official business. *See Stayton*, 126 Ohio App.3d at 163-164; *Schoemaker* at ¶ 14. Nor does it connote "any finite period of time" for which the officials must be delayed. *Dunn* at *4; *accord Wellman* at ¶ 18; *Schoemaker* at ¶ 15; *In re R.B.* at ¶ 19.

{¶48} In an effort to convince us to abandon the standard, the State points to

language from *State v. Pack*, 2023-Ohio-1522, ¶ 14-15 (12th Dist.), in which the Twelfth District declined to use a "substantial stoppage" framing to assess the sufficiency of an OOB conviction. But *Pack* tells only part of the story. *Pack* relied on the Twelfth District's prior decision in *State v. Ertel*, 2016-Ohio-2682 (12th Dist.). And *Ertel* makes clear that the Twelfth District rejected our "substantial stoppage" standard in part because it was "substantially similar . . . to that which ha[d] been consistently employed" in the Twelfth District, and therefore unnecessary. *Id.* at ¶ 10.

**{¶49}** The standard we have developed through our cases offers a method for separating mere de minimis distractions or annoyances from actions that truly "hamper[] or impede[]" an official in their duties. *See In re R.B.*, 2021-Ohio-3749, at ¶ 23 (1st Dist.) (holding that the court could not "conclude that R.B. caused any 'substantial stoppage'" because "any purported delay caused by R.B.'s action was de minim[i]s under the circumstances"); *In re S.J.*, 2023-Ohio-3441, ¶ 35 (1st Dist.) ("Any purported delay attributed to the defendant's conduct must be more than de minim[i]s under the circumstances."); *Coffman*, 2024-Ohio-1182, at ¶ 29 (1st Dist.) ("The state did not establish that Coffman's brief flight was anything more than a de minimis interference . . . ."). Not every minor delay truly hampers or impedes an officer's business, so not every minor delay becomes a crime.

**{¶50}** We therefore hold, as we have long held, that to "hamper[] or impede[]" an officer in the commission of their duties, a defendant's conduct must interpose a more-than-de-minimis hindrance or impediment between that officer and the officer's objective. The effect of this more-than-de-minimis hindrance or impediment on the officers is what we have labelled a "substantial stoppage."

b.

**{¶51}** Applying our standard to this case, we conclude the State put forth

19

evidence sufficient to find that Chambers's course of conduct—including his aggressive shouting at officers and D.K.—caused a substantial stoppage that hampered or impeded the officers' investigation.

{¶52} Chambers's shouting came at a moment when the officers were trying to gather the stories of both Chambers and D.K. Officer Mitchell testified that he had finished interviewing D.K. and his partner had finished interviewing Chambers, and that the two were trying to "swap[] roles" to cross-reference the two stories when Chambers began his more aggressive shouting and movements. Rather than swapping, both officers were forced to stop their investigation and focus solely on Chambers.

{¶53} Chambers's shouting and argument raised the temperature of the whole interaction and forced the officers' investigation to a grinding halt. This was not a momentary or fleeting stoppage. Chambers's disruptive shouts predictably changed the whole course of the encounter. Regardless of the length of delay, the State presented evidence that Chambers's actions entirely derailed the officers' ongoing efforts to investigate the situation. This was sufficient evidence of a "substantial stoppage."

{¶54} The State's evidence and the inferences therefrom, taken in the light most favorable to the State, could support findings (1) that Chambers shouted and argued with the purpose of obstructing, impeding, or delaying the officers, and (2) that this conduct in fact caused a more-than-de-minimis stoppage of the officers' official business. Thus, the evidence was sufficient to sustain Chambers's conviction with respect to those elements of R.C. 2921.31(A). The first assignment of error is overruled.

### B. Resisting Arrest

{¶55} In his second assignment of error, Chambers argues the State did not

offer sufficient evidence to support his conviction for resisting arrest under R.C. 2921.33(A), which provides, "No person, recklessly or by force, shall resist or interfere with a lawful arrest of the person or another." Within this statute are four essential elements, all of which the State must prove: (1) that the officers arrested the defendant, (2) that said arrest was lawful, (3) that the defendant resisted or interfered with that arrest, and (4) that said resistance or interference was effected either recklessly or by force.

**{¶56}** Chambers's arguments address only the first and second elements—i.e., whether an arrest occurred and whether it was lawful.

### 1. Knowledge of Arrest

**{¶57}** "'An arrest occurs when the following four requisite elements are involved: (1) An intent to arrest, (2) under a real or pretended authority, (3) accompanied by an actual or constructive seizure or detention of the person, and (4) which is so understood by the person arrested.'" *State v. Carroll*, 2005-Ohio-4048, ¶ 8 (1st Dist.), quoting *State v. Darrah*, 64 Ohio St.2d 22, 26 (1980). This means that, to convict under R.C. 2921.33(A), "the evidence must show that the defendant should have reasonably understood that she was being detained." *In re M.H.*, 2021-Ohio-1041, ¶ 27 (1st Dist.).

**{¶58}** Chambers contends that the State introduced no evidence to prove he understood that he was under arrest. Chambers relies heavily on the fact that the officers never told him he was under arrest, and on the officers' assurances prior to the altercation that he was not under arrest and would not be handcuffed. The State argues that Chambers's constant refrain that he was not going to go to jail suggests otherwise.

**{¶59}** This case bears salient similarities to *In re M.H.*, where this court held that evidence of officers' attempts to physically restrain a detainee, along with the

detainee's protestations against her arrest, were sufficient to support a finding that the detainee knew she was under arrest. *See id.* at ¶ 32-33. In that case, the detainee had "pulled away" from an officer who had "grabbed [her] wrist," at which point the officer took her to the ground, subdued her with the officer's bodyweight, and attempted to place her in handcuffs. *Id.* at ¶ 30. Although the arrestee was never told that she was under arrest, this court held that the officers' actions in grabbing and subduing her constituted "a course of conduct for which an arrest was the obvious and inevitable outcome." *Id.* at ¶ 32. Further, we noted that the defendant had vocally protested being arrested, which indicated her awareness of what the officers were doing. *Id.* at ¶ 30, 32.

{¶60} So, too, in Chambers's case. Like the arrestee in *In re M.H.*, Chambers repeatedly expressed his concern that the officers intended to take him to jail and repeatedly asked the officers what he had done. *Compare In re M.H.*, 2021-Ohio-1041, at ¶ 30 (1st Dist.) ("M.H. stated 'I didn't do nothin'' and expressed confusion as to what she was being 'arrest[ed] for.'" (Bracketed text in original.)). And as in *In re M.H.*, the trial court here could find, based on the officers' actions in taking Chambers to the ground, subduing him against the grass, and placing him in handcuffs, that the officers had engaged in a "course of conduct for which an arrest was the obvious and inevitable outcome." *See id.* at ¶ 32. Thus, the evidence was sufficient for a reasonable factfinder to conclude that Chambers understood he was being arrested. *See id.* at ¶ 33.

### 2. *Lawfulness of Arrest*

{¶61} But the State must also show that the arrest the defendant resisted was *lawful.* To constitute a "lawful arrest" within the meaning of the resisting-arrest statute, "the arresting officer must have probable cause," i.e., "a reasonable basis to believe that the offense for which the defendant has been arrested did, in fact, occur."

*State v. Glenn*, 2004-Ohio-1489, ¶ 23 (1st Dist.); *accord In re M.H.* at ¶ 25. Proof of reasonable suspicion is not enough. *In re J.C.*, 2023-Ohio-3070, ¶ 8 (1st Dist.); *see also State v. Raines*, 124 Ohio App.3d 430, 432 (1st Dist. 1997) ("[F]leeing from a request for a *Terry*-type stop, while not behavior we condone in any way, does not constitute the crime of resisting arrest.").

**{¶62}** Chambers argues that the officers lacked probable cause to arrest him for OOB when they began to arrest him. If this were so, then his resistance to that arrest would have been lawful. The State argues that the officers had probable cause to arrest him for OOB when the arrest began.

**{¶63}** We have already held that the trial court could find from the evidence presented that Chambers's actions obstructed official business in violation of R.C. 2921.31(A). And because the facts underlying that evidence were known to the officers on the scene, those officers had probable cause to believe that Chambers had committed the crime of OOB. Because the officers' seizure of Chambers's arms and ensuing attempts to subdue him occurred after that probable cause existed, the arrest was lawful.

**{¶64}** We therefore hold that the State's evidence was sufficient to support the trial court's findings that Chambers's arrest was lawful, and that Chambers knew he was being arrested. Chambers does not challenge any other component of his resisting-arrest conviction. The second assignment of error is overruled.

## IV. CONCLUSION

**{¶65}** For the foregoing reasons, the State's evidence was sufficient to support the challenged findings underlying Chambers's convictions for OOB under R.C. 2921.31 and for resisting arrest under R.C. 2921.33. Having thus overruled his two assignments of error, we affirm his convictions.

Judgments affirmed.

**BOCK** and **MOORE, JJ.,** concur.